IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 18, 2012 Session

## STATE OF TENNESSEE v. ROY LEN ROGERS

**Appeal from the Circuit Court for Rhea County**
**No. 16878   J. Curtis Smith, Judge**

**No. E2011-02529-CCA-R3-CD - Filed September 23, 2013**

The Defendant, Roy Len Rogers, was convicted by a Rhea County jury of first degree premeditated murder, second degree murder, and reckless endangerment. Subsequently, the trial court merged the second degree murder conviction into the first degree murder conviction and imposed a mandatory life sentence for that conviction and a concurrent term of eleven months and twenty-nine days for the reckless endangerment conviction. In this direct appeal, the Defendant contends (1) that the trial court erred by denying his motion to suppress evidence found during the search of his home; (2) that the evidence was insufficient to support his convictions and that the verdicts were inconsistent; (3) that the trial court erred by refusing to allow the Defendant to play a 911 tape; (4) that the trial court improperly admitted irrelevant photographs of tires of the Defendant's vehicle; (5) that the State withheld Brady material, specifically the statement of a potential suspect; and (6) that a juror evidenced bias by her actions and body language prior to deliberations. Following our review of the record and the applicable authorities, we determine that there is no reversible error in the judgments of the trial court and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Keith H. Grant (at trial and on appeal), Chattanooga, Tennessee; and Robert D. Philyaw (at trial), Signal Mountain, Tennessee, for the appellant, Roy Len Rogers.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Michael J. Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In the late evening hours of July 29, 2007, the forty-year-old victim, Gregory Keith Brown, was inside the bedroom of Vanessa Rogers's apartment when he was killed by a bullet that pierced the window and struck him in the head. Mrs. Rogers lived in Country Village Apartments on Blythe Ferry Road in Dayton. As a result of this shooting, a Rhea County grand jury, on August 6, 2007, charged the Defendant with the first-degree premeditated murder of the victim, the felony murder of the victim during the attempted murder of Mrs. Rogers, and the attempted first degree murder of Mrs. Rogers. See Tenn. Code Ann. §§ 39-12-101, -13-202. The Defendant's case proceeded to trial in October 2010.

The evidence at the Defendant's trial revealed the following facts. The Defendant met Vanessa Rogers[1] in October 2006, and the couple married shortly thereafter in December 2006. While married, the Defendant worked at Soddy Daisy Pawnshop, and the couple, along with their respective children, lived on Dayton Mountain, next door to the Defendant's parents. The Defendant owned quite a few guns and ammunition and would often shoot at targets in the backyard. The Defendant was described as a "collector" of guns, often attending gun shows.

Mrs. Rogers described the marriage as "[r]ocky" and stated that the Defendant was very controlling and threatening from the start. By March 2007, the marriage ended, and Mrs. Rogers moved away from the Defendant's residence. She and her daughter, Ciera Bennett, initially moved in with Mrs. Rogers's mother, Loretta Hawkins. They did not live with her mother for very long, moving to an apartment in Country Village Apartments in the weeks that followed.

Mrs. Rogers stated that the Defendant did not "take the separation . . . well," calling her constantly and frequently driving by her residence. According to Mrs. Rogers, when she lived with her mother, the Defendant would even knock on the door. When Mrs. Rogers moved to Countryside Village Apartments, the Defendant continued to drive by her residence. Due to the numerous telephone calls, Mrs. Rogers changed her phone number, but the Defendant somehow managed to get that new number, and continued to call her incessantly even though she had asked him to stop. She estimated that "sometimes there w[ere] probably hundreds of calls a day."

When the Defendant refused to stop driving by her apartment and calling her, Mrs. Rogers involved the police. After the police came to Mrs. Rogers's apartment on several

---

[1] Her name was no longer Rogers by the time of trial; it was Collett. She had remarried. We will refer to her as "Mrs. Rogers" for purposes of this opinion.

occasions, they advised her to seek an order of protection. According to Mrs. Rogers, the Defendant had also "threatened her life" during a phone conversation, saying that "if he couldn't have [her,] no one else could." She did obtain an order of protection, but despite that order, the Defendant continued to stalk and harass her.

After they separated, Mrs. Rogers hired an attorney to file for a divorce. Although she believed that the divorce was being processed in April, she later learned that the paperwork was not actually filed until June 15, 2007. During that time, on June 8, 2007, Mrs. Rogers met the victim. Prior to their first meeting, the victim and the Defendant had already discussed Mrs. Rogers. According to Mrs. Rogers, during her first conversation with the victim, he already "knew all about" her from the Defendant. She and the victim initially met in Ringgold, where the victim lived. They began dating, and the victim would then come visit her at her apartment in Dayton.

After Mrs. Rogers and the victim started dating, the Defendant began calling the victim. According to Mrs. Rogers, the victim would sometimes get six to eight calls or text messages from the Defendant a day. Sometimes, the Defendant would leave the victim voicemail messages. Mrs. Rogers listened to some of those messages and heard the Defendant say, "what's your relationship with my wife, why are you seeing my wife, things like that." Mrs. Rogers stated that the victim told the Defendant to stop calling him.

On Saturday, July 28, 2007, Mrs. Rogers and her daughter, Ms. Bennett, were at home in their apartment. Pursuant to advice from a domestic violence counselor, Mrs. Rogers had placed a windchime on her door, so she would be alerted to any intruders. While they were watching television that evening, the windchimes "started to jingle[.]" Ms. Bennett "jumped" and went to look through the peephole in the door. Mrs. Rogers testified that her daughter then said, "Mama, it's Len." Mrs. Rogers called 911, stating that they had a prowler at the home; however, she never stated during the 911 call that it was the Defendant outside. According to Mrs. Rogers, the order of protection was in effect at that time, and the Defendant was not supposed to be at her apartment. When the police arrived, the Defendant had already left the area.

The following morning, on July 29, 2007, Mrs. Rogers and her daughter went to church together. They returned to church later that day for an evening service. Prior to this occasion, the Defendant had followed Mrs. Rogers "[s]everal times[,]" including to and from church. She had reported the "stalking" to the police, filing reports to document the incidents.

After the evening service had concluded on July 29, 2007, the victim met Mrs. Rogers at her apartment around 8:00 p.m. Mrs. Rogers, the victim, Mrs. Rogers's daughter, and her

daughter's boyfriend all went to dinner in Cleveland, and after dinner, they went to visit Mrs. Rogers's son. According to Mrs. Rogers, the Defendant called the victim three or four times during this time, but the victim ignored those calls. Before returning to Mrs. Rogers's apartment, they dropped off her daughter's boyfriend at his house. They arrived back at her apartment between 11:15 and 11:30 p.m.

The victim, an electrician, was leaving to go out of town the next day, so he had packed a suitcase. He had previously decided to spend the night with Mrs. Rogers because he was "worried with everything going on[.]" Mrs. Rogers went into the bedroom to show the victim where to put his suitcase and to help him pick out his clothes for the following day. The victim's .380 handgun, which was holstered, was lying on a bedroom chair at that time.[2] The victim had brought the handgun to give to Mrs. Rogers for her protection. While Mrs. Rogers was standing beside the victim in her bedroom, she heard a "pop" and "felt . . . a burning on [her] left hand and the side of [her] face." She saw blood drip onto the victim's hand, and the victim fell to the floor. Upon realizing that the victim had been shot, she ran to her daughter's room to get the phone in order to call 911. Mrs. Rogers initially reported that the victim had shot himself.

Mrs. Rogers testified that the Defendant had threatened to kill her at least twice, that he had said to Mrs. Rogers's sister that Mrs. Rogers "was as good as dead," and that in the past, he had threatened Mrs. Rogers with a gun. According to Mrs. Rogers, the Defendant did not call her anymore after the victim had been shot.

Ms. Bennett, Mrs. Rogers's daughter, eighteen at the time of trial, confirmed the many incidents of stalking, harassment, and repetitive phone calls by the Defendant against her mother. Ms. Bennett also heard some of the threats the Defendant made to her mother. According to Ms. Bennett, the Defendant would call and say, "Dead"; her mother would then ask, "What are you saying?"; and the Defendant would respond, "D-E-A-D." The Defendant also called Ms. Bennett's phone on a number of occasions, prompting her to change her number. Ms. Bennett confirmed that she saw the Defendant outside their apartment on the night before the shooting when alerted by the windchimes.

Mrs. Rogers's mother, Loretta,[3] testified, confirming several of the events about which Mrs. Rogers had previously testified. Loretta testified that, when Mrs. Rogers and the Defendant first separated and Mrs. Rogers moved in with Loretta, the Defendant would wake

---

[2] Later testing confirmed that the pistol had not been fired.

[3] Because Ms. Hawkins and her daughter Dottie have the same last name, and both testified at trial, we will refer to them by the first name for the sake of clarity. We intend no disrespect in so doing.

her up every morning by ringing the doorbell and leaving notes on the door. He did this at least eight times until Loretta had Mrs. Rogers tell him to stop. Loretta eventually had to have her home phone disconnected because the Defendant would not quit calling. Loretta also said that the Defendant would follow them while they were out.

Mrs. Rogers's sister, Dottie Hawkins, also testified about the incidents of stalking, harassment, and voluminous phone calls from the Defendant. According to Dottie, the Defendant phoned her one time and told her that he was on his way to kill Mrs. Rogers. Dottie called the police and informed them of the threat, so the police went directly to Mrs. Rogers's home and escorted Mrs. Rogers from the apartment. Dottie testified that she resembled her sister, and on one occasion, she borrowed her sister's vehicle. While driving her sister's car, "apparently" the Defendant thought that she was Mrs. Rogers, and he tried to "run [her] off the road[.]" On another occasion, Dottie saw the Defendant with a weapon, and he threatened "to use it on [her]." According to Dottie, the Defendant told her that he wanted her dead because she "looked like" her sister.

Dottie estimated that "[f]rom the separation to the night of the murder, [the Defendant] probably called [her] making threats about [her] sister probably 100 to 150 times." Dottie testified that the Defendant had also threatened Ms. Bennett's "life."

Dottie confirmed that she was married to Terry Janow and that, on the night of the shooting, she and her husband were in bed asleep. After receiving a call that the victim had been shot, they got up and went to Mrs. Rogers's apartment.

Janice Franklin, a friend of Mrs. Rogers, testified about five or six occasions where the Defendant stalked them while she was out with Mrs. Rogers, including one occasion when he followed them from church, following them "through town[.]" Ms. Franklin also witnessed three or four phone calls from the Defendant to Mrs. Rogers.

Deputy Gerald Brewer of the Rhea County Sheriff's Department (RCSD) testified that he measured the distance from Mrs. Rogers's apartment to the Defendant's home on Dayton Mountain, which he determined to be 7.9 miles on the most direct route or 8.1 miles on an alternate route. When he followed the posted speed limits on the direct route, the trip took approximately ten minutes, but when he drove about ten to fifteen miles over the posted limit, it only took about seven minutes.

Detective Chris Hall of the RCSD investigated the scene, finding a bullet hole in Mrs. Rogers's bedroom window. He also found a 9mm shell casing on the ground outside the window. When he was outside, he was able to see clearly inside Mrs. Rogers's bedroom because there was a gap in the window covering. He also observed an area outside between

the air conditioner unit and the window where part of the moss "was mashed down where someone had been standing in that area." He testified that, from the depression of the moss, he was able to determine "that someone had been standing right there at the edge of the window."

Det. Hall then went to investigate the area surrounding the apartment. In a nearby roadbed, approximately one hundred feet from the apartment building, he found evidence that a vehicle had left that area, including a set of tire tracks, with three visible longitudinal stripes, coming out of the roadbed. There "was not enough detail" in the tracks for tests to make a positive identification of any vehicle. Det. Hall also found "fresh skid marks" where it appeared that the"vehicle had dragged the underside, . . . like the vehicle had backed out, or came out and bottomed out."

In the hours that followed, the Defendant was picked up by the police for questioning and interviewed by Tennessee Bureau of Investigation (TBI) Special Agent Luke Muhonen. During the interview, which began at 3:46 a.m., the Defendant said that he had made arrangements for his children to spend the night with his parents that evening because his air conditioning was not working. When he asked for a lawyer, the interview ceased.

After obtaining a search warrant, a search of the Defendant's home was conducted. During the search, officers found two 9mm shell casings.[4] Officers also searched the Defendant's vehicles on the property. Inside a Dodge Durango, officers confiscated a camera and, on that camera, found pictures taken on July 12, 2007, of Mrs. Rogers's apartment with two vehicles parked out front. The Defendant's 1993 Honda Civic was also taken from the property for further examination. The tires on the Civic had three longitudinal stripes, similar to the ones found on the scene at the nearby roadbed. There were also several "fresh scrape marks" on the undercarriage of the Civic. The marks on the vehicle were determined to be "fresh" because they were "real bright" and "[t]he metal was shining through[.]"

The State introduced evidence about the Defendant's phone calls on the evening of the shooting. After learning of the shooting, the Defendant's brother, Russell Rogers, then an RCSD officer, called the Defendant on his cell phone at 12:05 a.m. but received no answer. Given the initial report of a suicide or accidental shooting at Mrs. Rogers's

---

[4] These exhibits were also referred to as "fired," "expended," or "spent cartridge cases" or a "hull." We believe all of these terms refer to the outer metal covering of a bullet. For consistency, we will use the term "shell casing."

apartment, Russell[5] was afraid his brother was involved. Russell then called his parent's house at 12:09 a.m, located next door to the Defendant's, and they informed Russell that the Defendant "was at his house." Russell called the Defendant's house at 12:10 a.m. but still the Defendant did not answer. The Defendant returned Russell's call, using his cell phone, at 12:12 a.m.

Daniel Witherow testified that the Defendant called him from his cell phone at 12:09 a.m. and that they talked for two or three minutes. According to Witherow, the Defendant called him a second time from the Defendant's home phone at 12:16 p.m, again talking for two or three minutes "at the most." During that first call from the Defendant's cell phone, Witherow said he could hear an oscillating fan that the Defendant usually kept running in his bedroom, leading Witherow to conclude that the Defendant was at home during the call. He also recalled the Defendant's home phone ringing in the background.

In addition to the Defendant's home phone, two cell phones were linked to the Defendant, although the Defendant later disputed that one of the cell phones belonged to him. It was determined that between 9:08 a.m. and 10:05 p.m. on July 29, 2007, the Defendant called the victim's cell phone fifteen times. The last outgoing call from the Defendant's cell phone was made at 11:08 p.m., and the next incoming call was from his brother Russell after midnight. The Defendant's home phone records reflected an outgoing call at 11:20 p.m., and the next call was made at 12:16 a.m. to Witherow. The third, disputed cell phone showed an outgoing call at 10:08 p.m. and then not another call until 1:03 a.m.

TBI testing revealed that the two 9mm shell casings from the Defendant's residence and the 9mm shell casing found at the scene were all fired by the same weapon. All three shell casings were determined to be Winchester manufactured and 9mm Luger cartridge cases. The bullet which killed the victim was determined to be of 9mm caliber. Among the many brands that could have fired the bullet recovered from the victim's body was a Star-manufactured weapon. There was also testimony presented about an audit of the Soddy Daisy Pawn Shop, where the Defendant had worked from August 2006 until April 2007. While working there, the Defendant was often alone in the store. The pawnshop was audited for a period of September 3, 2007, to September 2, 2008. During this audit, it was discovered that a 9mm firearm, a Star Super brand, was missing. The weapon was received by the pawn shop on March 26, 2007, and the Defendant was the employee who processed that transaction. The police later placed a hold on the weapon on April 25, 2007, meaning that the item was not for resale. The Defendant would have been the employee to notate the hold on the firearm in the computer system.

---

[5] Again, for the sake of clarity, we will refer to this witness by his first name.

Det. Hall confirmed that he and Agent Muhonen interviewed Terry Janow in connection with this shooting. Det. Hall stated that Mr. Janow was not a suspect, but they wanted to talk to him to "clarify some stuff." They did search Mr. Janow's home and his vehicles, finding nothing to connect Mr. Janow to the victim's murder.

The Defendant testified on his own behalf, denying any involvement in the victim's murder. He also denied ever threatening Mrs. Rogers or taking the 9mm weapon from the pawn shop, claimed that one of the cell phones did not belong to him, and maintained that his conversations with the victim were cordial. The Defendant asserted that he only called the victim on the day of the victim's murder because the victim had called him first, and he was trying to return the victim's call. During his second conversation with Witherow that evening, the Defendant was aware of the shooting at Mrs. Rogers's apartment. Believing that he might be questioned about the incident, the Defendant told Witherow that he was going to write down the times of the phone calls, and Witherow told the Defendant that "he would save the calls and lock them on his phone so they were there."

The Defendant explained that 9mm shell casings were found at his house because Mr. Janow had come to his home trying to sell him a 9mm handgun. They fired the weapon outside a few times to test it, but the Defendant said he ultimately did not purchase the weapon from Mr. Janow. The Defendant also claimed that Mr. Janow and Mrs. Rogers had an affair, which continued "up until the time" he met her.

The Defendant offered several character witnesses on his behalf. The Defendant's father explained that, although the Defendant "couldn't hit the broad side of a barn with a handgun[,]" he was extremely accurate with a "[l]ong gun" because he "was in the ROTC rifle team." His father confirmed that Mr. Janow came to the Defendant's residence trying to sell a 9mm firearm.

The Defendant's brother was recalled to the stand and testified that the Defendant was "not very [good] at all" with a handgun. Russell said that his brother did not have a reputation for violence. Witherow was recalled to the stand and testified that, when he spoke with the Defendant immediately following the shooting, the Defendant sounded "normal" and did not sound "upset, or nervous, or worried[.]"

The State called Karen Zimmerley, a former employer of the Defendant's, in rebuttal. Ms. Zimmerley testified that, on one occasion, she overheard the Defendant threaten to kill Holly Peak,[6] the Defendant's ex-wife. Ms. Peak, the mother of the Defendant's children, was called to the stand and testified that the Defendant told her that "if he couldn't have [her],

---

[6] Her last name was also Zimmerley at time of trial.

nobody could." According to Ms. Peak, the Defendant frequently drove by her residence following their separation and called her incessantly. She likewise was forced to obtain an order of protection against the Defendant. Mrs. Rogers was recalled and denied ever having an affair with Terry Janow.

Following the conclusion of proof, the Defendant was convicted as charged in Count 1 of the first degree premeditated murder of the victim, found guilty of the lesser-included offense of second degree murder in Count 2, and found guilty of the lesser-included offense of reckless endangerment in Count 3. See Tenn. Code Ann. §§ 39-13-103, -202, -210. The trial court merged the first degree and second degree murder verdicts and imposed the mandatory life sentence. For the reckless endangerment conviction, the Defendant was sentenced to a concurrent term of eleven months and twenty-nine days. This timely appealed followed.

## ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether the trial court erred by refusing to suppress evidence obtained during the search of the Defendant's home; (2) whether the evidence was sufficient to support his convictions, including whether the verdicts were inconsistent; (3) whether the trial court erred by refusing to allow the Defendant to play a 911 tape; (4) whether the trial court properly admitted, as relevant evidence, photographs of the Defendant's tires; (5) whether the State withheld Mr. Janow's statements in violation of Brady v. Maryland; and (6) whether a juror evidenced bias against the Defendant by her body language and actions prior to deliberations.[7] We address each issue in turn.

### I. Motion to Suppress

The Defendant argues that the trial court erred by not suppressing the evidence obtained as a result of the search warrant and accompanying affidavit. Specifically, on appeal, he argues that (1) the officer who signed the affidavit "had no firsthand knowledge of the important facts alleged in the affidavit"; (2) information supplied to the affiant and included in the affidavit was clearly false; (3) the information obtained from Mrs. Rogers, and included in the affidavit, was not entitled to a presumption of reliability; and (4) no copy of the warrant was left with the Defendant or at his residence, in violation of Rule 41, Tennessee Rules of Criminal Procedure. The State replies that the trial court properly denied the Defendant's motion to suppress the evidence because the police obtained the evidence from the Defendant's home pursuant to a valid search warrant.

---

[7] For the purpose of clarity, we have reordered and renumbered the issues as presented by the Defendant in his brief.

*A. Search Warrant*

The search warrant was issued on July 30, 2007, at 3:52 p.m., just following the shooting and the same day the Defendant had been taken into custody and questioned. The affidavit in support of the search warrant for the Defendant's residence states, in its entirety, as follows:

Comes now Chris Hall, after being duly sworn, deposes and says:

(a.) That I am a certified police officer within the State of Tennessee. I have 13 years experience in law enforcement and have presently been assigned as a criminal investigator with the Rhea County Sheriff's Department. This position I have held seven or more years.

(b.) Around midnight, on July 29 and July 30, 2007, Emergency Services dispatched The Rhea County Sheriff's Department to 3311 Blythes Ferry Road, APT. 8, in Rhea County Tennessee. The apartment is leased by Vanessa Rogers. Upon arriving at the scene, Sgt. Gerald Brewer, Rhea Co. Sheriff's Department (RCSD), found the body of Gregory Keith Brown, white male, D.O.B. 02/27/67, dead in the bedroom of the apartment. The victim appeared to have a gunshot wound to the head. Vanessa Rogers leased the apartment.

(c.) When Sgt. Brewer arrived at the scene Ciera Bennett and her mother Vanessa Rogers was [sic] present.

(d.) Facts that I have ascertained from investigation indicate that Len Rogers had been greatly disturbed by his separation from his wife, Vanessa Rogers. This was aggravated by the relationship that Vanessa Rogers had developed with the victim, Gregory Keith Brown. The relationship began approximately eight weeks ago.

(e.) Investigation indicated that Vanessa Rogers had applied for and had received an Order of Protection from Rhea County Family Court. Said Order of Protection required Len Rogers to have no contact with Vanessa Rogers or be around where she is located. Said Order was granted on May 2, 2007, and required Len Rogers to divest himself of any weapons, including firearms. The bases for issuance of the Order were allegations of Len Roger[s] threatening to harm or kill Vanessa Rogers. Len Rogers was seen with firearms the day before the homicide.

(f.) Subsequent to the Order of Protection, Len Rogers was arrested on the complaint of Vanessa Rogers, verified by witnesses for violation of the Order. When arrested he was found to have a rifle in the car in which he was driving.

(g.) Deputy David King investigated another complaint, on June 11, 2007, by Vanessa Rogers about hang up phone calls. Deputy King was present at the Apartment when another phone call rang. Nothing was said but the caller ID indicated a certain number. When [D]eputy King left the apartment in his patrol car, he immediately observed [] Len Rogers driving his vehicle within 100 yards of the apartment. Deputy King stopped the vehicle and asked Len Rogers to see his phone. The number on the phone was identical to the number that had appeared on the [p]hone belonging to Vanessa Rogers.

(h.) According to Vanessa Rogers, Len Rogers had been driving in front of her apartment without cause, almost daily since the issuance of the order of protection. Further, Vanessa Rogers had change[d] her telephone number and Len Rogers had been contacting her boyfriend, Gregory Keith Brown, by telephone in order to communicate with Vanessa Rogers. She would be present on occasion when these phone call[s] would be made. She would not talk to Len Rogers.

(i.) On July 28, 2007, approximately 11:00 pm, Vanessa Rogers heard a noise outside her previously mentioned apartment. Her daughter Ciera Bennett went to investigate and looked out the peephole in the door. She saw Len Rogers outside the door. Vanessa immediately called the Sheriff's Department. When deputies arrived, no one was found.

(j.) According to Vanessa Rogers, at the time of the shooting, she was in the bedroom with the victim. She was standing next to the victim who was also standing and packing a suitcase. She heard a sharp popping sound and felt [a] stinging sensation on her face and hands. Instantly she observed the victim fall to the floor and appeared to be bleeding from the head. I found slivers of broken glass on the bed in the bedroom.

(k.) At the scene, I found the deceased with an apparent bullet wound with entry point slightly above the victim's ear. I saw a bullet hole in through the screen and thermo pane of the bedroom window of the room in which the body was found. Investigation of the area outside of the window [led] to the discovery of a 9mm Luger shell casing. The ground area around the bedroom window was wet, muddy, and contained what appeared to be moss type plants that had been disturbed by footprints.

(l.) I also discovered an old unimproved roadway with heavy ruts approximately 50 to 75 yards away from the apartment. I discovered tire track[s] leading out from this road onto the pavement. There was a gouged out mark where a vehicle bottomed out getting out of that unimproved road. Besides the earth being disturbed in the road, there were plants that have been broken, torn with parts of the plants missing.

(m.) Len Rogers owns and operates a 1993 blue Honda Civic with Tennessee license plate number 087 DVQ. My fellow officers informed that this is the vehicle they see Len Rogers drive constantly.

(n.) At approximately 2:00 a.m., Sgt. Gerald Brewer and Deputy Mike Alderson, of the RCSD, arrived at the residence of Len Rogers. They found Len Rogers at that residence. He was wearing pajama pants no shirt and no shoes. He was aware of the shooting at his wife's apartment. Len Rogers's residence is more particularly described in Exhibit "A" attached to and made part of this Affidavit as if copied verbatim herein.

(o). Based upon the foregoing, I am of the opinion and belief that the offense of criminal homicide has been committed in Rhea County, Tennessee, and that there is probable cause that evidence of such criminal offense may be concealed on the premises of Len Rogers described more particularly in Exhibit "A" attached hereto.

WHEREFORE, as such Law Enforcement Officer acting in performance of my duty, I pray that the court issue a warrant authorizing the search of the person of Len Rogers, along with his residence described in Exhibit "A", including any and all vehicles, specifically a blue 1993 Honda Civic with Tennessee license plate number 087 DVQ, outbuildings, trailers and storage containers found on said property for any evidence of the crime of criminal homicide, in violation of T.C.A. 39-13-202 for items including firearms, clothing, shoes, ammunition, shell casing[s], bullets, soil samples, vegetation samples, shooting supplies, records including telephone records, firearm[']s information, owner[']s manuals, gun shot residue, and tires and/or tire impressions. Also, that said search be made day or night.

*B. Hearings*

On May 26, 2010, the trial court first addressed the Defendant's various motions to suppress.[8] The trial court determined that leaving a copy of the search warrant at jail where the Defendant was being housed and where he actually received it, rather than at the Defendant's unoccupied residence, satisfied the requirements of Tennessee Rule of Criminal Procedure 41. The hearing was recessed to allow the Defendant time to file a supplement to his motion and raise additional grounds.

---

[8] The Defendant had also filed a motion to suppress his statements to police, arguing that those statements were not voluntarily made. That issue was also addressed at this hearing. We will recount the testimony and findings relevant only to the issues presented on appeal.

On June 3, 2010, the trial court again heard argument of the various motion to suppress issues. During this hearing, the trial court addressed the Defendant's argument that Mrs. Rogers's information should not be afforded a presumption of reliability as a citizen informant because she had a motive to falsely accuse the Defendant. The Defendant relied on the case of State v. Williams, 193 S.W.3d 502 (Tenn. 2006), to support his argument, but the trial court found that the Williams case was not applicable under these facts. In so concluding, the court reasoned, "It's true the parties had had some issues but it's not a situation where they were both standing there looking at an officer and they were about to -- both were about to be arrested. But even -- so I find that her information is presumptively reliable. But even if so, if not so the affidavit does establish her basis of knowledge. And she gave specifics, her -- what she gave was specific enough . . . ."

Det. Hall testified that he investigated the shooting death of the victim and signed as the affiant on the search warrant for the Defendant's residence, obtaining "the information that was placed in the affidavit . . . ." Det. Hall acknowledged that he was approached by an investigator from the defense counsel's office. At that time, when the investigator asked Det. Hall about the search warrant, Det. Hall said that he "did not think" he obtained the search warrant in the Defendant's case, believing that Agent Muhouen was possibly the affiant. He clarified for the investigator that, without his "case file[,]" he could not say "for sure[.]" After later reviewing the file, Det. Hall realized that, although he did not personally type the search warrant, he did provide the information for the warrant to the assistant attorney general. He remembered several other officers being present at the time the warrant was prepared, including Deputy King and Agent Muhouen.

The trial court ruled, "I accept [Det.] Hall's explanation as to his conversation with [the defense's] investigator." The trial court again continued the hearing, allowing time for more research and preparation on the issue of the alleged false or misleading statements in the affidavit.

A final hearing on the motion to suppress was held on September 30, 2010. Deputy King was first to testify at hearing. Deputy King said that the day following the murder, he provided Det. Hall with information in preparation of the search warrant. He was with Det. Hall and several others in the district attorney's office at the time. The information he relayed involved another complaint by Vanessa Rogers on June 11, 2007, regarding hang up phone calls. He had gone to Mrs. Rogers's residence on this complaint, and while there, another phone call came in. Deputy King wrote down the number from the caller ID on a notepad, but he did not know what happened to that piece of paper. When Deputy King left the apartment on that occasion, he observed the Defendant driving within one hundred yards of the apartment. He stopped the Defendant's vehicle and asked to see the Defendant's phone. He, and his supervisor who had just arrived at the stop, were unable to "figure [] out"

the Defendant's phone to determine if it was the Defendant who called the apartment, so they let the Defendant go. Deputy King testified that he did not recall whether the number on the phone was the same as the number on the caller ID. He also did not recall telling Det. Hall that the numbers were the same and did not know where Det. Hall would have obtained that information. He said that he did not intentionally give false or misleading information to Det. Hall. Deputy King opined that it was "possible" that the statement in the affidavit, stating that the two phone numbers were the same, was false.

On cross-examination, Deputy King clarified that he was not the one to actually see the Defendant on this occasion, that it was Mrs. Rogers's daughter who pointed out the Defendant driving by the residence, and that he continued to talk with Mrs. Rogers and her daughter before leaving the residence. Deputy King stated that he was returning to the sheriff's department when he encountered the Defendant. He turned around and initiated a traffic stop; the stop took place directly across from Mrs. Rogers's apartment. Deputy King and his supervisor discussed the order of protection in place and whether the Defendant was in violation of that order by driving back and forth in front of Mrs. Rogers's residence. Because the Defendant was driving on a public road, they decided to let him go.

On redirect, Deputy King confirmed that he was unable to obtain a number from the Defendant's phone and, therefore, could not have provided that information to Det. Hall.

Det. Hall again testified that he took out a search warrant in this case, providing the information to the assistant district attorney for him to type the warrant. According to Det. Hall, there were several people present at this time, and Det. Hall also "gathered information" from Deputy King for preparation of the warrant. Det. Hall testified that Deputy King told him at the time that the number on the Defendant's phone was identical to the number that was on Mrs. Rogers's caller ID.

On cross-examination, Det. Hall confirmed that he either obtained or observed all of the information provided in the search warrant, including information from Vanessa Rogers, her daughter, and from other fellow officers about violations of orders of protection and "things" of that nature. Det. Hall had no reason to believe that the information provided by Deputy King was incorrect. Det. Hall agreed that the language in the search warrant was not a direct quote but a summary of what Deputy King had told him. According to Det. Hall, when he included Deputy King's statement in the affidavit, he had no intention of putting in a false or misleading statement. Det. Hall stated that he always endeavored to "put forth the facts" establishing probable cause as accurately as possible. He confirmed that he knew it was improper to put a false statement in an affidavit for a search warrant and that, if he was unsure about a certain piece of information, he would not include it therein. He averred that

paragraph (g.) of the affidavit, to the best of his recollection, was "exactly the information" he received from Deputy King.

On redirect, Det. Hall was not aware if an order of protection was in place on June 11, 2007, when the phone call was allegedly made to Vanessa Rogers. Det. Hall was shown Deputy King's police report regarding the June 11 incident, but Det. Hall could not recall whether he reviewed the report in preparation of the warrant. It was noted at the hearing that, in the report, Deputy King did not state that the two numbers were the same.

The trial court found the Defendant's claim regarding a false or reckless statement in the affidavit to be without merit, ruling as follows:

> I cannot find here that there was a false statement made with intent to deceive, under the first category. I cannot find that there was a false statement recklessly made under the second category that would entitle [defense counsel] to be successful. Even if, even if the inquiry is the way that you were arguing it, that is look at -- trying to look at his phone to see if there was a number recently called that had called Mrs. Rogers' house, even if that were the case, I still don't find that the [D]efendant has shown a false statement made with intent to deceive, and I don't find that a false statement was recklessly made. Even if it were recklessly made, it was not essential to probable ca[u]se. There are numbers of other statements made, (a.) through (o.), I believe, ever how many there are that would have established probable cause without this particular statement.

*C. Standard of Review*

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. Meeks, 262 S.W.3d at 722.

*D. Probable Cause*

The Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued except upon probable cause. Illinois v. Gates, 462 U.S. 213 (1983); State v. Jacumin, 778 S.W.2d 430, 431-32 (Tenn. 1989). Probable cause has been defined as a reasonable ground for suspicion, supported by circumstances indicative of an illegal act. Henning, 975 S.W.2d at 294.

Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." Id. A finding of probable cause made by an issuing magistrate is entitled to great deference. State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999) (citing State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)). Therefore, the standard to be employed in reviewing the issuance of a search warrant is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993).

*1. Informant Status of Mrs. Rogers*

The Defendant, again relying on Williams, 193 S.W.3d 502, argues that Mrs. Rogers's statements should not have been given a presumption of reliability. According to the Defendant, because of the ongoing contentious divorce, Mrs. Rogers had a motive to falsely accuse the Defendant, and therefore, she was not a citizen informant and nothing in the affidavit established her reliability. The State responds that the trial court correctly determined that Mrs. Rogers should get a presumption of reliability as a citizen informant. However, the State continues that, even if Mrs. Rogers is not treated as a citizen informant, the affidavit nonetheless satisfies the two-pronged "basis of information" and "reliability" test.

When a court reviews an affidavit for probable cause, the court must first determine whether the informant was a citizen informant, a criminal informant, or neither. Williams, 193 S.W.3d at 507. A citizen informant is a citizen or bystander who "acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety." Id.; State v. Stevens, 989 S.W.2d 290, 294 (Tenn. 1999) (quoting State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993)). Additionally, a citizen informant "does not expect any gain or concession in exchange for his information." Stevens, 989 S.W.2d at 294. The information provided by the citizen informant is presumed reliable. Id. at 293. In contrast, a criminal informant is someone from the criminal milieu, or, in other words, a "citizen with ties to the criminal community." Williams, 193 S.W.3d at 507; Melson, 638 S.W.2d at 355.

Often, a criminal informant is described as a citizen who supplies information to the police "in exchange for some concession, payment, or simply out of revenge against the subject." Stevens, 989 S.W.2d at 294. Since the criminal informant might have a "motive to exaggerate, falsify, or distort the fact to serve [personal] ends," the information must be examined by a magistrate under a two-part analysis: (1) the affidavit must show the basis for the informant's knowledge; and (2) the affidavit must show the reliability of the informant or the information ("Jacumin test"). Id. at 293-94 (citing State v. Cauley, 863 S.W.2d 411, 417 (Tenn.1993)); Jacumin, 778 S.W.2d at 436.

In Williams, our supreme court recognized that information may also be provided by someone who is neither a criminal informant nor a pure citizen informant but is instead motivated to inform on a suspect out of personal bias or revenge. 193 S.W.3d at 507-08; see also State v. Siliski, 238 S.W.3d 338, 367 (Tenn. Crim. App. 2007). In such cases, absent "additional particularized information in the affidavit" to bolster or corroborate that the information was supplied by a concerned citizen informant, the affidavit must satisfy the two-pronged "basis of information" and "reliability" test for information supplied by a criminal informant. Williams, 193 S.W.3d at 507-08 (citing Stevens, 989 S.W.2d at 294-95); see Siliski, 238 S.W.3d at 367.

Williams indicates that our supreme court has accepted the "modern view . . . that as a general proposition any person purporting to be a crime victim or witness may be presumed reliable, though the police must remain alert to the existence of any circumstances making that presumption inoperative in a particular case." 2 Wayne R. LaFave, Search and Seizure, § 3.4(a) (5th ed.) (citing cases). In Williams, the informant provided information to police about her boyfriend's possession of cocaine only after she herself had been arrested for domestic assault. The court held that where the information regarding the defendant's drug possession was given by his girlfriend "only when she was in the midst of a domestic disturbance that led to her arrest and the arrest of the defendant," and the investigator "did not consider whether she was acting for revenge or a similar motivation," such "information was not presumptively reliable." Williams, 193 S.W.3d at 508. The court continued that the affidavit established probable cause under the two-prong Jacumin test because the affidavit established the informant's basis of knowledge prong and the information's reliability, including that the information was "corroborated by . . . defendant's prior drug-related conviction." Id.

In adopting this modern view, the Williams court relied on the case of United States v. Phillips, 727 F.2d 392 (5th Cir. 1984). In Philips, the defendant, who was convicted of possession of an unregistered sawed-off shotgun, possession of a firearm which had been made into a sawed-off shotgun without complying with the provisions of the Gun Control

-17-

Act of 1968, and possession of a firearm by a convicted felon, moved to suppress evidence seized under the search warrant. The Williams court analyzed as follows:

> In [Phillips,] for instance, the affidavit in support of a search warrant was based on information from an estranged wife whose husband had threatened to shoot her. The court observed that, unlike "citizen informants," some informants may be involved with the defendant whose person or residence is to be searched and may "have personal reasons for giving shaded or otherwise inaccurate information to law enforcement officials . . . ." Id. at 397 (quoting United States v. Flynn, 664 F.2d 1296, 1302-03 (5th Cir. 1982)). The court emphasized that the wife "had recently quarreled with and left her husband" and that she did "not fit comfortably within the description of an 'eyewitness-bystander.'" [Id.] Although the court found that the information was not "presumptively reliable," it went on to conclude that probable cause had been established under a totality of circumstances analysis. Id.; see also Hodsdon v. State, 698 P.2d 1224, 1228 (Alaska Ct. App.1985) (court determined that informant was "somewhere between a citizen informant and a police informant" and thus, applied traditional probable cause analysis).

Williams, 193 S.W.3d at 507-08.

Following Williams, this court was presented with a similar argument in Siliski. In Siliski, the informant was a former employee of the defendant's, who quit due to unacceptable working conditions and low pay. The employee thereafter reported the state of the defendant's kennels and animals, and the defendant was convicted of nine counts of animal cruelty. On appeal, the defendant argued that search warrant was not supported by probable cause because the employee, "at the time she gave the information, had an axe to grind against the [d]efendant." This court held that the defendant's argument was "sheer speculation[,]" as there was no basis for concluding "that an employee who feels she is underpaid and called to work in unacceptable conditions automatically has an 'axe to grind.'" Siliski, 238 S.W.3d at 367. The Siliski court concluded that the record supported the determination of the trial court that the employee was a citizen informant and, thus, presumed to be reliable. Id.

The trial court in this case found Mrs. Rogers to be a citizen informant and presumptively reliable and overruled that part of the Defendant's motion to suppress. The trial court distinguished Williams, reasoning that although "the parties had had some issues[,]" this was not a case where the Defendant and Mrs. Rogers were about to be arrested when Mrs. Rogers offered the information. The trial court further determined that, even if

-18-

Mrs. Rogers's information was not afforded the presumption, the affidavit established her basis of knowledge" and the information she provided was "specific enough[.]"

We cannot accept wholesale the Defendant's argument that parties going through a contentious divorce cannot be considered citizen informants if they are a victim or witness to a crime simply because that crime was allegedly committed by the other party involved. However, in cases such as these, if the police know of possible bias or motive to falsify, then police should take the additional steps outlined in Williams to ensure the informant's reliability, i.e, "additional particularized information in the affidavit" is needed to bolster or corroborate that the information was supplied by a concerned citizen informant. This is not to suggest, however, that all "domestic violence victims are undeserving of the presumption of veracity accorded other victim-witnesses," for such is certainly not the case. LaFave § 3.4(a) (citing United State v. Patane, 304 F3.d 1013 (10th Cir. 2002)). Accordingly, what the police should be concerned with is an apparent motive to falsify or allegations made out of spite. Id. (citing cases).

We agree with the trial court that Mrs. Rogers should be classified as a citizen informant in this case. Based upon the circumstances present to the officers, Mrs. Rogers appeared to be a victim of domestic violence, including threats, harassing phone calls, and stalking by the Defendant, all of which had been well documented over the proceeding months. It would be hard to fathom where a divorce of that nature would not be characterized as "contentious." The police were faced with a victim, Mrs. Rogers's new boyfriend, who suffered a gunshot wound to the head in Mrs. Rogers's bedroom. Accordingly, we conclude that the record supports the determination of the trial court that Mrs. Rogers was a citizen informant and, thus, presumed to be reliable. Accordingly, there need be no further showing regarding her veracity or basis of knowledge. Nonetheless, even if Mrs. Rogers were not afforded a presumption of reliability, we agree with the trial court that the affidavit is also sufficient to satisfy the Jacumin test, providing the basis of Mrs. Rogers's knowledge and including specifics of the couple's tumultuous relationship, corroborated by police investigation. The information provided in the affidavit was sufficient to establish probable cause for the issuance of a search warrant.

### 2. False Statement

The Defendant also asserts that the search warrant was obtained based on an affidavit that contained a materially false statement and, therefore, the evidence seized from the residence should have been suppressed on that basis. Specifically, the Defendant argued that the statement attributed to Deputy King in the affidavit—that Deputy King said that the number he saw on the Defendant's phone was identical to the number he observed on Mrs. Rogers's caller ID—was clearly false. The Defendant submits that this statement of Deputy King's was essential to the establishment of probable cause, as it was the only direct link

from an unbiased source that would establish that the Defendant had been contacting Mrs. Rogers, and that the statement was included to mislead the magistrate. The State responds that Deputy King testified that he did not intentionally give false or misleading information to Det. Hall and that Det. Hall testified that he did not intentionally include false or misleading information in the affidavit. The State continues, even if it was mistakenly included, it was not an intentional or reckless material misrepresentation.

In Franks v. Delaware, the United States Supreme Court held that the fruits of a search should be excluded when the affidavit in support of the search warrant contains deliberately or recklessly false statements by the affiant, which are material to the establishment of probable cause. 438 U.S. 154, 172-73 (1978). The "fraudulent misrepresentation of a material fact will invalidate a search warrant." State v. Little, 560 S.W.2d 403, 406 (Tenn. 1978). Our supreme court has defined two situations in which false information within the supporting affidavit mandates the application of the exclusionary rule despite the affidavit's facial sufficiency:

> (1) a false statement made with intent to deceive the [c]ourt, whether material or immaterial to the issue of probable cause, and

> (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

Id. at 407. Allegations of negligence or innocent mistakes are insufficient to invalidate the search warrant. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999). "[I]n order to be entitled to relief, a defendant must show that the reckless statements were necessary to the finding of probable cause." Id. The defendant has the burden to establish the allegation of perjury or reckless disregard by a preponderance of the evidence. Id. (citing Franks v. Deleware, 438 U.S. at 156).

From the testimony at the motion to suppress hearing, it was apparent that Deputy King was never able to determine if the two phone numbers were the same. Thus, the statement was false at the time it was made by Det. Hall. However, Deputy King stated that he did not intentionally give false or misleading information to Det. Hall. Det. Hall continued to aver at the hearing that Deputy King made the statement to him that the number on the Defendant's phone was identical to the number that was on Mrs. Rogers's caller ID and that he had no reason to believe that the information was incorrect. Det. Hall also testified that, by including the statement from Deputy King in the affidavit, he had no intention of including false or erroneous information. The trial court accredited the officers'

testimony that the statement was not made or included in the affidavit with the intent to deceive the magistrate. Because this was a credibility determination, and in the absence of proof to the contrary of the officers' intent, we conclude that the evidence does not preponderate against the trial court's finding that there was no intentionally false statement in the affidavit. See Odom, 928 S.W.2d at 23.

We must consider, then, whether the statement was recklessly made, and if so, whether it was essential to establishing probable cause. See Little, 560 S.W.2d at 407. Again, "[r]ecklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time." Id. The record reflects that statement was false at the time it was made; however, in order to establish recklessness, the Defendant must also demonstrate that the affiant did not have reasonable grounds for believing it, at that time. When analyzing false statements in a facially valid supporting affidavit, we do not look beyond the conduct of the affiant. See Franks, 438 U.S. at 172 (holding "[t]he deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant"); Little, 560 S.W.2d at 406-07 (noting that to foreclose inquiry into false statements in a supporting affidavit would effectively transfer the discretion which rests with the magistrate to the affiant). Det. Hall confirmed at the hearing that he either obtained or observed all of the information provided in the search warrant, including information from Mrs. Rogers, her daughter, and from other fellow officers about violations of orders of protection and "things" of that nature. Thus, Det. Hall was aware that Mrs. Rogers had obtained orders of protection against the Defendant, that she frequently complained he violated those orders, and that police investigation of those complaints often led to corroboration that a violation had in fact taken place. He testified that he had no reason to believe that the information provided to him by Deputy King was incorrect. Given the evidence of record, we conclude that Det. Hall had reasonable grounds for believing the facts as represented in the affidavit. Therefore, the evidence does not preponderate against the trial court's finding that the statement was not recklessly made. See, e.g., State v. Richard M. Parrot and Edith L. Parrott, No. 03C01-9709-CR-00408, 1999 WL 320712, at *5 (Tenn. Crim. App. May 21, 1999) (affiant stated in affidavit that officers went with informant to the defendants' home and observed informant meet with one of the defendants, but at the time he sought to have the warrant signed, affiant had not spoken with the officer in charge of personally observing the meeting and did not know that the officer had failed to observe the meeting; trial court found that the statements in affidavit were neither intentionally nor recklessly false but, instead, resulted from the "careless composition of conclusory facts"). Moreover, we likewise agree that, even without the erroneous statement, the affidavit contained sufficient information to establish probable cause. The Defendant is not entitled to relief on this issue.

*3. Firsthand Knowledge*

-21-

In a related issue, the Defendant submits that Det. Hall had no firsthand knowledge of the important facts in the affidavit. Specifically, he states, "[t]he affidavit was invalid on its face due to the fact that it was based upon hearsay information with no showing of a basis of knowledge or reliability." The Defendant notes that the affidavit in question relies on information from three sources: (1) the affiant's "'investigation,' although no showing of what this consisted of was made"; (2) information from Deputy King, which information is shown to have been false; and (3) information from Mrs. Rogers, with no showing of her reliability. The affidavit may contain hearsay and need not reflect the direct personal observations of the affiant. Melson, 638 S.W.2d at 354. As we have determined that the Defendant's issues regarding the statement attributed to Deputy King and the presumption of reliability to be afforded Mrs. Rogers have no merit, we likewise conclude that this issue is also meritless.

*E. Service of Search Warrant*

As his final suppression issue, the Defendant contends that no warrant was left with him or at his residence as required by Tennessee Rule of Criminal Procedure 41. The Defendant, who was incarcerated in the county jail at the time of the search, notes that he did not receive a copy of the search warrant until after the search occurred. The State responds that leaving a copy of the search warrant at the jail was sufficient because the Defendant was unavailable at his residence.

Tennessee Rule Criminal Procedure 41(e)(4) governs leaving a copy of the search warrant and a receipt for any property taken. The Rule states,

> The officer executing the warrant shall:
>
> (A) give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property; or
> (B) shall leave the copy and receipt at a place from which the property was taken.

Tenn. R. Crim. P. 41(e)(4). Rule 41(g)(6) provides that serving officers' failure "where possible-[to] leave a copy of the warrant with the person or persons on whom the search warrant was served" requires exclusion of evidence seized during the warrant's execution. Tenn. R. Crim. P. 41(g)(6). Personal service of a search warrant upon a defendant, therefore, is not strictly necessary for compliance with Rule 41(e). See State v. Watson, 227 S.W.3d 622, 645 (Tenn. Crim. App. 2006) (holding that service of a search warrant upon a defendant's counsel satisfied Rule 41's notice requirement).

-22-

The intent of Rule 41 is "'to secure the citizen against carelessness and abuse in the issuance and execution of search warrants.'" State v. Coffee, 54 S.W.3d 231, 233 (Tenn. 2001) (quoting Talley v. State, 345 S.W.2d 867, 869 (Tenn. 1961)). The purpose of providing notice to the owner of seized property is to notify the owner of the source of the seizure so that the owner can pursue available remedies for its return. City of West Covina v. Perkins, 525 U.S. 234, 240 (1999). However, "the prevailing view is that noncompliance with . . . [notice] does not compel exclusion of the evidence obtained pursuant to the warrant, at least absent prejudice to the defendant or a deliberate disregard of the notice provision." LaFave § 4.12(b) (citing cases).

We agree with the State that this case is controlled by State v. Henretta, 325 S.W.3d 112, 140-41 (Tenn. 2010), and not the cases cited by the Defendant, Johnson v. State, 348 S.W.32d 295 (Tenn. 1961), and State v. Steele, 894 S.W.2d 318 (Tenn. Crim. App. 1994). In Henretta, the inmate defendant was not given a copy of the search warrant at the time of its execution, and blood, hair, and saliva samples were collected from the defendant. It was not disputed that copy of the warrant was left with a prison official at the facility in which the defendant was incarcerated or that the defendant received a copy of the warrant through the prison's mail system about one week after the search. The defendant argued that this method of service ran afoul of the requirements of Rule 41 and, as a result, required suppression of the evidence obtained pursuant to the warrant. The defendant attested that there was no prison rule prohibiting officers from handing him a copy of the warrant, and as such was not prohibited, they should have given him a copy personally. Our supreme court concluded that, "even if there was no prison rule forbidding such personal service at the time of the search, the method of service utilized was adequate to satisfy the requirements of Rule 41[]."[9] Henretta, 325 S.W.3d at 140-41.

The Defendant attempts to distinguish his case from Henretta because he was in the county jail rather than prison and the sheriff's department employees could have easily accessed him. The Defendant also notes that the officers in Henretta "did as instructed by prison officials and left a copy for the defendant because they believed that they could not personally hand it to [him]." The Defendant argues that, in his case, the State provided "no explanation for the failure to serve him . . . ."

We disagree with the Defendant's attempts to distinguish his case from Henretta. The Henretta court cited with approval the case of State v. Johnny Ray Roach, No. C.C.A. 4, 1989 WL 22815 (Tenn. Crim. App. Mar. 15, 1989). In Roach, the defendant was arrested and taken to jail while police officers were searching his premises pursuant to a search warrant. Although the defendant was shown the search warrant at the scene, he was not

_____

[9] Our supreme court analyzed the issue under a prior version of the rule.

served with a copy of the warrant at the time of the search. However, upon completion of the search, an officer took a copy of the warrant to the jail where the defendant was incarcerated and placed the copy in the defendant's property bag. Later, the warrant was transmitted to the defendant's attorney by the jailor in charge of the property bag. This court held that delivering the warrant to the defendant in this way satisfied the service requirements of Rule 41. Id. at *2. The Defendant likewise attempts to distinguish his case from Roach, noting that in Roach, the defendant was shown a copy of the search warrant at the time it was executed and the defendant was informed a copy was being placed in his property bag.

Relying on our holding in Roach, the Henretta court concluded "that even if there was no prison rule forbidding such personal service at the time of the search, the method of service utilized was adequate to satisfy the requirements of Rule 41[]." 325 S.W.3d at 140 (emphasis added). Just as in Henretta, we find no meaningful distinction between the method of service employed in Roach and the method employed in the matter before us. "In each instance, the defendant was incarcerated, and the warrant was served upon him indirectly via prison officials, although there was no indication that circumstances precluded personal service." Id. at 141. Accordingly, we hold that, given the Defendant's incarcerated status, delivery of the warrant to jail officials immediately upon its execution satisfied the requirements of Rule 41. The Defendant's motion to suppress was properly denied.

## II. Sufficiency of the Evidence

The Defendant has challenged the sufficiency of the evidence supporting his convictions for premeditated murder, second degree murder, and reckless endangerment. Specifically, he contends that there was neither sufficient evidence to establish his identity as the shooter nor that the murder was premeditated.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913,

914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, the jury convicted the Defendant as charged in Count 1 of the first degree premeditated murder of the victim. First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d).

In Count 2, as a lesser-included offense of first degree felony murder (with the underlying felony being the attempted murder of Vanessa Rogers), the jury convicted the Defendant of the second degree murder of the victim. Second degree murder is defined as the knowing killing of a victim. See Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result-of-conduct offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

The Defendant also challenges the sufficiency of the evidence for his conviction of reckless endangerment in Count 3 as a lesser-included offense of the attempted first degree murder of Mrs. Rogers. A person commits reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). Our supreme court has held that, "for the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne,

7 S.W.3d 25, 28 (Tenn. 1999) (citing State v. Fox, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996)). The court further held that "the term 'zone of danger' may be employed to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." Id.

First, with respect to the Defendant's identity as the perpetrator of these offenses, the Defendant notes that there were no eyewitnesses to the shooting, that there was an explanation for the matching shell casings found at his residence and, beyond the matching shell casings, that there was no credible physical evidence to place him at the scene. The identity of the perpetrator is an essential element of any crime. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

The Defendant correctly notes that he did provide the jury with an explanation regarding the presence of the matching shell casings found at his house; however, what he fails to recognize is that the jury was free to disregard his explanation. The presence of matching shell casings at his house directly linked him with the shooting. Moreover, the Defendant fails to acknowledge that his identity can also be established by circumstantial evidence. There was ample testimony that the Defendant stalked and harassed Mrs. Rogers and members of her family following the couple's separation. Once Mrs. Rogers began to date the victim, the Defendant also frequently called the victim, calling him multiple times on the day of his murder. The proof also connected the Defendant's car to the scene, including the presence of tire tracks with similar characteristics and fresh scrapes on the undercarriage of the Defendant's vehicle. Other proof showed that the Defendant possessed a 9 millimeter weapon, likely a Star Super that he had stolen from his pawn shop employer. The Defendant's attack is essentially an argument as to the credibility of the witnesses and assertions that conflicts in the proof must be construed in favor of the Defendant. Of course, this argument must fail in light of the well established law set forth above. The evidence was sufficient for a rational jury to identify the Defendant, beyond a reasonable doubt, as the shooter.

Next, the Defendant challenges the element of premeditation. He argues that, because he was found guilty of first degree premeditated murder, not felony murder, any

premeditation would have to involve the victim, not Mrs. Rogers. The State responds that the evidence is sufficient to support the Defendant's conviction for first degree premeditated murder. According to the State, even if the Defendant were not attempting to kill the victim, but instead Mrs. Rogers, he did strike and kill Brown, and under a theory of "transferred intent," the Defendant is still guilty.

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See Davidson, 121 S.W.3d at 614; Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The State's theory on appeal is still, at least in part, that the Defendant intended to kill Mrs. Rogers but instead killed the victim, citing to Millen v. State, 988 S.W.2d 164 (Tenn. 1999), in support of that proposition. In Millen, our supreme court considered whether a defendant who intends to kill a specific person but instead kills a bystander is guilty of first degree premeditated and deliberate murder via application of the transferred intent doctrine.[10] Id. at 164. The supreme court noted that transferred intent is a common law doctrine, and its application under the Criminal Code "is, at best, unclear, at least with regard to first degree murder." Id. at 166. Ultimately, the court held that "unintended victim" cases are most appropriately prosecuted as felony murder; however, resort to the transferred intent doctrine is not necessary to establish premeditated and deliberate first degree murder. Id. at 167-68. In so holding, the court said,

> The legislature has broadly defined an "intentional" act as: "a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the

---

[10] Millen arose under the first degree murder statute which required a killing be intentional, premeditated, and deliberate to constitute the offense. 988 S.W.2d at 164, n.2; see Tenn. Code Ann. § 39-13-202(a)(1) (1991) (amended 1995).

conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1991) (emphasis added). A plain reading of this statute as applied to first degree murder indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., "cause the result." In short, if the evidence demonstrates that the defendant intended to "cause the result," the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder.

Id. at 168.

However, the principles of Millen are not dispositive of the case at bar. In this case, the jury was charged with the first degree premeditated murder of the victim, the felony murder of the victim during the attempted murder of Mrs. Rogers, and the attempted murder of Mrs. Rogers. The instructions to the jury were clear.[11] The jury by its verdict clearly rejected a notion of transferred intent, i.e., that the Defendant intended to shoot Mrs. Rogers but instead hit the victim. Thus, we will not resort to a theory of transferred intent in this case and agree with the Defendant that to uphold the Defendant's conviction for first degree premeditated murder, the State must have established beyond a reasonable doubt that the killing of the victim was premeditated.

The Defendant, citing State v. Jackson, 173 S.W.3d 401, 409-410 (Tenn. 2005) (affirmed reduction of defendant's premeditated murder conviction to conviction for second degree murder because element of premeditation was lacking), argues that the proof in this case established none of the factors that would demonstrate premeditation. We disagree.

After viewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence for the jury to have found that the Defendant intentionally and with premeditation killed the victim. The Defendant had a motive for the killing—he had recently separated from Mrs. Rogers and was jealous of her relationship with her new boyfriend, the victim. Following the couple's separation, the Defendant stalked and harassed Mrs. Rogers, threatening to kill her and several of her family members. Upon learning of the victim's and Mrs. Rogers's relationship, the Defendant began to harass the victim, including calling him multiple times on the day of the murder. Prior to the evening of the murder, the Defendant had taken pictures of the victim's and Mrs. Rogers's vehicles parked in front of

---

[11] After Millen, the Tennessee Pattern Jury Instructions were amended to conform with the language contained therein. See T.P.I — Crim. 7.01. That instruction is absent from the premeditated murder charge given to the jury in this case.

-28-

Mrs. Rogers's residence. The State's theory at trial was that the armed Defendant traveled to Mrs. Rogers's residence late at night, and both cars—the victim's and Mrs. Rogers's—were present. Upon these observations, the Defendant proceeded to a nearby side street, parked his car in a roadbed, and taking his weapon with him, proceeded to peer into Mrs. Rogers's bedroom window. There was testimony, based upon the moss that was "mashed down" just outside the bedroom window, "that someone had been standing right there at the edge of the window." The window was partially unobstructed, so the Defendant could see the victim and Mrs. Rogers standing side by side. There was testimony from which the jury could infer that the Defendant was proficient with weapons, including handguns, despite his assertions to the contrary. The handgun was never recovered. Although there was a weapon inside Mrs. Rogers's bedroom at the time, testimony established that the weapon was holstered and had not been fired. Based upon phone records from the Defendant's home phone, the Defendant accomplished all of this in under one hour. In phone conversations immediately following the shooting, the Defendant was described as normal and calm. The Defendant also stated during his phone conversation with Witherow that he was going to note the time of call, in an effort to establish an alibi, if one was needed. Considering all of these factors, we conclude that the evidence was sufficient to establish the elements of premeditation and intent. Accordingly, the evidence is sufficient to support all of the Defendant's convictions.

As a separate issue, the Defendant also submits that the verdicts were inconsistent in that a rational jury could not find the Defendant guilty of first degree murder of the victim and also find him guilty of a lesser-included offense of felony murder (second degree murder). Specifically, he argues,

> [The Defendant] was indicted on two counts of murder, which espoused completely different theories. The first is that [the Defendant] intentionally shot the victim. The second is that [the Defendant] was attempting to shoot [Mrs. Rogers] and, instead of shooting her, shot the victim. As [the Defendant] could not have been convicted of premeditated first degree murder and felony murder, it appears the jury did not understand the essential elements of the crimes for which [the Defendant] was ultimately convicted.

The State responds that this court should not speculate as to the jury's rationale for convicting the Defendant of one count of premeditated murder and one count of second degree murder.

The Defendant was charged with alternative theories of killing the same victim in Counts 1 and 2, (premeditated and felony murder). The underlying felony in Count 2 was the attempted murder of Mrs. Rogers. When the jury determined that the Defendant lacked

-29-

the requisite intent to commit the underlying felony, i.e., lacked any intent to murder Mrs. Rogers, the jury properly concluded that the Defendant was not guilty of felony murder as charged. The jury then properly considered the next lesser-included offense of felony murder—second degree murder, i.e., a knowing killing of the victim. See State v. Ely, 48 S.W.3d 710, 720-22 (Tenn. 2001) (holding that second degree murder is a lesser-included offense of felony murder). The jury found that the Defendant knowingly killed the victim in Count 2, not that the Defendant knowingly killed Mrs. Rogers. Knowing is simply a lesser mental state; if the jury found the Defendant guilty of the premeditated and intentional killing of the victim in Count 1, such a finding necessarily encompassed the lesser mental state of knowing in Count 2.

We disagree that the verdicts were inconsistent in any way. Moreover, as noted by the State, even if they were, inconsistent verdicts have long been upheld in this State. See Wiggins v. State, 498 S.W.2d 92, 94-95 (Tenn. 1973) (our supreme court held that "consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment" and must be individually supported by the evidence); see also State v. Marlo Davis, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, at *7-11 (Tenn. Crim. App. May 21, 2013), perm. app. filed, (Tenn. July 23, 2013) (providing an in depth analysis of the applicability of the doctrines of inconsistent versus mutually exclusive verdicts in Tennessee). The Defendant is not entitled to relief on this issue.

*III. 911 Tape*

The Defendant contends that the trial court erred in not allowing the Defendant to play the tape of the 911 call Mrs. Rogers made the night before the incident in question, wherein she reported a prowler at her residence. According to the Defendant, giving a transcript to the jury is not the same as playing the audiotape because the audiotape would have had greater impact. The State responds that the trial court properly exercised its discretion when refusing to play the recording. The information the Defendant wanted to impart to the jury was accomplished by cross-examination and impeaching her with a transcript of the recording. The Defendant has failed to show that the trial court abused its discretion or that he was prejudiced in any manner. Furthermore, according to the State, because the audiotape of the 911 call is not a part of the record on appeal, the Defendant has waived any consideration of the issue.

At trial, Vanessa Rogers stated that, on the evening before the shooting, she had a prowler at her residence and that her daughter said it was the Defendant who was outside. On cross-examination, defense counsel asked Mrs. Rogers about the 911 call she made that evening. The relevant testimony was as follows:

-30-

Q. Let's move forward to July 28th. You stated that you all had a prowler outside your apartment, is that correct?

A. Yes.

Q. Okay. And just to make sure I recall what you said correctly, you, your daughter looked outside, saw [the Defendant], told you it was [the Defendant]?

A. Yes.

Q. And then you called 911, is that correct?

A. Yes.

Q. Do you recall what you told 911?

A. I believe she's the one that talked to them.

Q. Do you recall whether or not she or you either one told them that night that this was [the Defendant] outside?

A. I don't remember the exact conversation.

Q. Okay.

A. She had panicked when she saw him.

Q. Okay. If, indeed, this was [the Defendant], would you have told 911 that?

A. I don't know. I can't say for sure.

Q. Any reason why you wouldn't have told them that?

A. Scared. When you're scared you don't think.

Q. Okay. The fact of the matter is when you called that night you didn't know who was outside, did you?

A. My daughter did. I didn't see him. My daughter saw him. She looked through the peephole in the door.

Q. Do you remember telling 911 that she saw a shadow outside?

A. No.

Q. That looked like a tall man?

A. No.

Defense counsel then requested to play the 911 tape for the jury. The prosecutor responded, "If he's going to play the 911 tape, now is not the proper time. It would be in his proof. . . . All he can do is ask her did she make the statement, and she either admits it or denies it, and he can only play it if she denies it, a prior inconsistent statement . . . ." The prosecutor further noted that defense counsel was impermissibly seeking to use extrinsic evidence of a prior inconsistent statement by playing the 911 tape. Defense counsel responded that the witness had already denied making the statement and that he wanted to play the tape to show that she did in fact make such a statement. The trial court then excused the jury. Following an exhaustive jury-out hearing on the 911 tape, including discussion on issues of refreshing recollection and proper impeachment evidence, the court recessed for the evening.

The following morning when court reconvened, the prosecutor stated that he done some research over the evening on the admissibility of the 911 tape and learned the following,

> I did not realize that . . . the supreme court has amended the rules of evidence, not 613, but it comes in under 803, paragraph 26, relative to hearsay, and they have made a substantive change in how impeachment statements can come in . . . .
>
> I think the only proper procedure is, if they have this transcript, would be to show the witness the transcript, and then ask her if she recollects making that statement and, of course, if she denies it or says she [doesn't] know, then I think under the new rule, with all candor, then the state -- the extrinsic statement could be introduced. I would have to concede that point.

After more extensive discussion on the proper procedure to be employed for admission of the 911 tape, trial resumed.

Cross-examination of Vanessa Rogers continued:

Q. When we left yesterday we were discussing this prowler incident of July 28, 2007, do you recall that?
A. Yes, sir.
Q. I think you stated you did not recall whether or not you made a call to 911 that night, is that correct?
A. Correct.
Q. Since that time do you now recall whether or not you called 911 that night?
A. I do not recall.
Q. Okay. You do not recall calling 911 and saying my name is Vanessa Rogers, I live at Country Village Apartments?
A. I don't remember.
Q. Don't remember saying, I think I have a prowler, someone just tried to get in my front door?
A. I don't remember who made the call, whether it was myself or my daughter?
Q. Okay. Do you recall stating me and my daughter are home alone and I have a wind chime on my front door because of some problems I've been having, and we were just sitting here getting ready for bed, and all of a sudden the doorknob started turning, the wind chimes started chiming and she looked

out the peephole and she said that she could see a shadow standing there, but nobody was moving, do you recall that?

A. I do not.

Q. And later on do you recall stating she saw a shadow out there. Yes. She said it looked like a tall man, and my neighbors are not at home. Do you recall that?

A. I do not remember.

Q. Do you want to review the statement?

A. Sure.

Mrs. Rogers was then permitted time to review the statement. Questioning continued:

Q. . . . After reading that . . . do you recall whether or not you made that call?

A. I don't remember the phone conversation.

Q. Do you remember whether or not -- you said you don't remember the conversation, do you remember even making the call?

A. I do not.

Q. Okay. Do you remember giving a statement to Officer Chris Hall after this all happened?

A. I remember an officer being there, but I don't remember anything [about] who it was.

Q. Do you remember telling that officer, regarding this July 28th incident, that you called 911, when the police arrived he was gone?

A. I don't remember.

Defense counsel then approached the bench and requested to "introduce the actual tape of the call." The trial court ruled, "I'll allow you to introduce the transcript as an exhibit." The transcript was admitted as an exhibit, and the prosecutor stated that he had reviewed the recording and stipulated that it was "a correct transcript of the tape."

Neither party points to either Rule 613(b) or Rule 803(26) of the Tennessee Rules of Evidence in support of their respective arguments on appeal. They simply argue about whether the trial court's ruling to admit the transcript rather than actual tape was an abuse of discretion.

Because the trial court found that the transcript of the 911 call was admissible as substantive evidence under Tennessee Rule of Evidence 803(26), and allowed the transcript to be entered as an exhibit in the record, we will begin by addressing that exception to the hearsay rule. Rule 803(26) provides a hearsay exception for a testifying witness's prior

inconsistent statement. The statement is admissible as substantive evidence if the following conditions are satisfied:

1. The statement must be admissible under Tennessee Rule of Evidence 613(b).
2. The declarant must testify at the trial or hearing and be subject to cross-examination about the statement.
3. The statement must be audio or video recorded, written and signed by the witness, or given under oath.
4. The trial court must conduct a jury-out hearing to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) & Advisory Comm'n Cmts. Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

At trial, defense counsel thoroughly questioned Mrs. Rogers about her recollection of the 911 call, and after being permitted to review the transcript of the call, Mrs. Rogers was still unable to recall any details of the call. Accordingly, Mrs. Rogers was afforded the opportunity to explain or deny her prior statement, satisfying Rule 613. She was also subjected to cross-examination. While the trial court did hold an extensive jury-out hearing on the issue, the court did not make a specific determination as to whether the prior statement was made under circumstances indicating trustworthiness. However, the State conceded that the evidence pertaining to the 911 call was admissible under Rule 803(26) after the witness had been afforded the opportunity to explain or deny the same.[12] When defense counsel moved to admit the audiotape, the trial court instead permitted the transcript as an exhibit. The trial court did not err in admitting the statement as substantive evidence. See Davis, 2013 WL 2297131, at *15; State v. Michael Wayne Davis, M2010-02108-CCA-R3-CD, 2013 WL 105172, at *9 (Tenn. Crim. App. Jan. 9.2013), perm. app. denied, (Tenn. Apr. 11, 2013).

Nonetheless, the issue remains as to whether the tape or the transcript was the proper medium of the evidence to be admitted. There are three types of statements that fall within the ambit of Rule 803(26): (1) the statement must be audio or video recorded; (2) the

---

[12] We note that Mrs. Rogers's statements on the 911 call would qualify as excited utterances, a firmly rooted hearsay exception and bearing particularized guarantees of trustworthiness. See Tenn. R. Evid. 803(2).

statement must be written and signed by the witness; or (3) the statement must be given under oath. Only the first type of statement is applicable here. The Advisory Commission Comments to this section provide the following additional guidance:

> [T]his rule contains additional express requirements regarding the form of the prior statement so that the jury is assured that the statement contains the actual "words" of the witness on a prior occasion. For example the prior statement must be an audio or video recorded statement. A "police report" or insurance investigator's "transcription" of the recorded statement would not qualify since it is not literally the witness's own words contained on audio or video media.
>
> If not recorded, the prior statement can be in written form (created by the witness or by another) but then must be signed by the witness. The commission intends that the "signed" requirement must be equated with an actual signature as opposed to some email document which happens to have the witness's name on the address. Finally, the rule permits a prior statement to be treated as substantive evidence if given under oath.

In accordance with these comments, we agree with the Defendant that the recording of the 911 call, not the transcript, was the proper evidence to be introduced in this case.

However, the issue is still subjected to harmless error analysis. In making this determination, we agree with the State that inclusion of the recording in the appellate record would be helpful. Regardless, the State admitted that it was "a correct transcript of the tape." Any distinction regarding admission of the transcript versus the actual tape is tedious at best. Here, the Defendant was able to cross-examine Mrs. Rogers and impeach her credibility with the contents of the 911 call. The defense was able to get the information it sought before the jury as substantive evidence, i.e., that Mrs. Rogers never conveyed to 911 that evening that it was the Defendant who was prowling outside her residence. Any error in this regard is harmless. The Defendant's issue is without merit.

*IV. Tire Photographs*

The Defendant contends that the trial court erred by admitting the photographs of the tires of his vehicle because the probative value of the photographs does not outweigh their prejudicial effect, "especially given the fact that the TBI lab could not make" a definitive identification of the Defendant's tires. The State responds that the trial court properly admitted evidence of the tires of the Defendant's vehicle. The State argues that the photographs were relevant to show the similarity between the Defendant's tires and the tire tracks found at the scene and the fact that the TBI could not make a definitive match went to the weight not the admissibility of the evidence.

Det. Hall testified that it appeared that a vehicle had recently driven away from a roadbed nearby Mrs. Rogers's apartment. According to Det. Hall, he observed a "set of tire tracks coming out of the roadway[,]" and it appeared that the "vehicle had dragged the underside, had made some fresh skid marks like the vehicle had backed out, or came out and bottomed out." Det. Hall described that there were "1, 2, 3 longitudinal lines visible in the tire track" at the scene. Although they attempted to take "plaster casts of those tire prints" and sent photographs to the TBI lab, the lab was unable "to make an identification." The photographs of the tire tracks at the scene and the photographs of the Defendant's tires were introduced as exhibits to Det. Hall's testimony to show that, although the lab could not make a positive identification as to whether there was a match, the tread pattern on the Defendant's tires was similar to the pattern left at the scene.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies with the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005) (quoting Banks, 564 S.W.2d at 949).

In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A relevant photograph is generally admissible, Tenn. R. Evid. 402, unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

Relying on rules of relevance, defense counsel objected to admission of the photographs of the Defendant's tires. Defense counsel said, "I mean, how many tires on the road have this same tread pattern?" The prosecutor responded that Det. Hall had already testified that the photograph of the tire tracks at the scene showed three longitudinal stripes and that the photographs of the Defendant's tires showed the same type of longitudinal stripes and, therefore, the photographs were relevant. Defense counsel restated his objection, "[I]n these pictures, they're going to try to make that inference to the jury that this was [the Defendant's] car, but it could have been any car with those three lines." The trial court

overruled the Defendant's objection, "Well, it has some probative value. You can argue how much it has." Det. Hall then testified that the tires on the Defendant's vehicle likewise had three longitudinal stripes, and the photographs of the Defendant's tires were admitted into evidence.

The photographs were clearly relevant, showing that the Defendant's tires had three longitudinal stripes, the same as the tire pattern left at the scene. Additional photographs were admitted that showed "fresh scrape marks" on the undercarriage of that same car. We agree that the lack of definitive match of the tire tracks at the scene to the Defendant's tires goes to the weight and not the admissibility of the evidence. Therefore, the trial court did not abuse its discretion by admitting the photographs into evidence.

## V. *Brady* Violation

The Defendant contends that the State failed to disclose exculpatory evidence by failing to provide, prior to trial, documentation regarding the investigation by law enforcement of Terry Janow as a potential suspect in this matter. The State responds that Mr. Janow's statement was not favorable to the Defendant and that, furthermore, the delayed disclosure did not hinder the Defendant's ability to prepare a defense.

On cross-examination of Agent Muhonen, defense counsel asked if, as part of law enforcement investigation, anyone else was pursued as a possible suspect in the victim's murder. Agent Muhonen explained, "I don't know if you would describe it as a suspect, we had -- some information came out and we went and did -- Detective Hall and I went and did an interview" of Mr. Janow. According to Agent Muhonen, he and Det. Hall interviewed Mr. Janow because they "were trying to gather information[,]" and there had been "allegations made that [Mr. Janow] may have been involved in the shooting." Agent Muhonen then said that he had a copy of Mr. Janow's statement, taken on August 13, 2007, at 11:50 a.m., in his possession. Defense counsel then asked to view the statement; the prosecutor objected, arguing that the defense was not entitled to the statement either before trial or at trial because Mr. Janow was not a testifying a witness. The trial court then excused the jury for a jury-out hearing.

Defense counsel submitted that the State had committed a Brady violation, arguing as follows:

> First of all, . . . I think I was at least entitled to know they were interviewing this person. We asked for folks with information. . . . They interviewed this fellow and we were never given his name as far as an interview, and I've [been] given a list of 50 something potential witnesses, and people with information. This guy's name never came up on any of that.

. . . .

> . . . I think anybody with information regarding this case, that yes, we're entitled to know that, and second of all, I think the fact that they're looking at someone else is exculpatory. I think I would be entitled to any statements that person gets. If they're looking at other people who might have had some connection with this, I think that's exculpatory information that has to be turned over.

In response to the allegation of a <u>Brady</u> violation, the prosecutor averred,

> Well, Your Honor, under Rule 16 we're not obliged to do [defense counsel's] homework for him. We provide him with a list of potential witnesses, and if they testify, then he's provided, if they've given a statement, he's provided under the <u>Jencks</u> Rule with a copy of the statement, but we're under no obligation, unless the statement is patently exculpatory, we're not under an obligation to turn over every name of everybody that every officer talked to in this case, or may have had some need to talk to. That's not our obligation.

The trial court then submitted to defense counsel,

> I don't know that you can move from we're talking to someone that it's exculpatory. You're going to have to have more of a connection than simply the fact that they could talk to any number of witnesses that they may not use. They wouldn't necessarily be witnesses that gave information that was exculpatory.

Defense counsel replied that he was not asserting that Mr. Janow's statement was in fact exculpatory. He clarified, "What I'm saying is the fact they're looking at someone else is exculpatory evidence towards my client the fact that there's some indication that somebody else may have been involved in this crime, or may have committed this crime. I think that in and of itself is exculpatory."

The prosecutor, referring to the contents of Mr. Janow's statement, asserted that it was not exculpatory in nature. The trial court then looked at the actual statement, concluding, "I see nothing in the reasonably short statement that is of an exculpatory nature." However, regardless of entitlement, the trial court then allowed the defense to look at a copy of Mr. Janow's statement. Defense counsel agreed that the statement itself was not exculpatory but continued to argue, "the fact that the [S]tate had actually looked at other people and

interviewed other folks[, t]hat information would be exculpatory information." Defense counsel proceeded, "Now, it's not something I'd want at trial, it's something I would have wanted before, because evidently somebody somewhere had said you need to talk to Terry Janow. . . . That's the information that's exculpatory that's not been provided." The prosecutor replied that the information regarding Mr. Janow came directly from the Defendant to law enforcement.

Defense counsel moved for mistrial based on the State's failure to provide this information before trial. The trial court denied the motion.

In Brady v. Maryland, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citations omitted).

To prove a Brady violation, a defendant must demonstrate the following: (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). Evidence is favorable if it "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Johnson, 38 S.W.3d at 56-57 (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). In the case of a delayed disclosure of exculpatory information, as opposed to a complete failure to disclose, the inquiry is whether the delay prevented the defense from effectively preparing for and presenting the defendant's case. State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993); see Bagley, 473 U.S. at 682 (stating that failure to respond to Brady request may impair adversary process because defense "might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued"). The appellant bears the burden of proving a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 390.

In examining the elements of a <u>Brady</u> claim, we note that, although defense counsel stated he filed a request for discovery, no request appears in the appellate record. However, it does appear from the record that the State began providing discovery materials to the defense as early as May 2009. Moreover, even assuming that a proper request was made, as the State asserted, Mr. Janow was not presented as a witness at the Defendant's trial; thus, it does not appear that the State intentionally suppressed the evidence.

Our conclusion that the alleged <u>Brady</u> material is neither favorable nor material to the Defendant's case is more significant to our analysis. After being permitted to view Mr. Janow's statement to law enforcement, defense counsel conceded that Mr. Janow's statement itself was not exculpatory. However, defense counsel continued to argue that evidence that law enforcement officials had another suspect whom they investigated during the course of the investigation of the victim's murder was exculpatory in nature regardless of the results of the investigation. At trial, defense counsel was permitted to question Agent Muhonen and Det. Hall about whether they interviewed Mr. Janow in relation to this shooting and their reasoning for doing so. The officers testified that, after investigating Mr. Janow and verifying certain information, Mr. Janow was eliminated as a suspect. The defense was already presenting testimony to the jury insinuating that Mr. Janow committed this crime, not the Defendant. Defense counsel was aware of Mr. Janow and any possible motive prior to trial. We fail to see how the challenged evidence, simply the fact that Mr. Janow was actually interviewed and investigated, is exculpatory of the Defendant. <u>See, e.g.</u>, <u>Donald Wayne Strouth v. State</u>, No. 03C01-9507-CC-00195, 1997 WL 90636, at *8 (Tenn. Crim. App. Mar. 4, 1997) ("evidence of other suspects was presented to the jury and appellant was indeed aware that other suspects were considered"), <u>aff'd</u>, 999 S.W.2d 759 (Tenn. 1999).

It was further established that the officers only investigated Mr. Janow when the Defendant began shifting blame to Mr. Janow. The Defendant contends that, although he suspected Mr. Janow committed the murder prior to trial, "such is a far cry from having knowledge that the State has investigated, and taken a statement from a potential suspect." We disagree. The Defendant's circular argument must fail: He pointed the finger at Mr. Janow; Mr. Janow was interviewed; Law enforcement eliminated Mr. Janow as a suspect; Part of the defense strategy at trial was to accuse Mr. Janow of the murder; Defense counsel was allowed to see Mr. Janow's statement at trial, despite the ruling that there was no legal requirement for him to be so permitted; After viewing the statement, defense counsel acknowledged that Mr. Janow's statement was not exculpatory to the Defendant; and Defense counsel then requested a mistrial for simply not being informed that the interview took place. He cannot now be heard to benefit from efficient investigation by law enforcement at his behest.

With these considerations in mind, we conclude that any delay did not prevent the defense from effectively preparing for and presenting the Defendant's case. Accordingly, the Defendant failed to sustain his Brady claim, and the trial court committed no error in denying him relief on this basis.

*VI. Juror Bias*

The Defendant contends that the jury foreperson had made a decision on guilt prior to the closing of proof at trial as evidenced by her actions and body language. When this was brought to the attention of the trial court, the juror should have been recused from service or a mistrial granted. The State responds that the issue is waived because the record is void of any request for a mistrial. Alternatively, the State submits that the Defendant has failed to prove that the jury foreperson was biased or favored the State in any way.

During a jury-out hearing following the direct examination of a defense witness, defense counsel brought the juror's actions to the attention of the trial court. The following exchange thereafter took place:

[DEFENSE COUNSEL]: We've noticed one juror who, this morning especially, has done a lot of eye rolling and looking over to other jurors and just kind of eye rolling and whatnot during ou[r] case in chief, and we would ask to have her excused. We don't think that she's certainly showing any -- I don't know if she's made up her mind one way or the other, but she's certainly showing some -- having some actions, Judge, that are not indicative of someone who has not made up their mind at this point in the case, and actually her actions tending to be trying to persuade other jurors of the same thing. [Co-counsel for the Defendant] has had --

[PROSECUTOR]: Your Honor, you can't ask jurors to be robots. I mean, they're human beings and they have, you know, feelings and, you know, some people are more demonstrative than others, and that's just their interpretation, you know. That would be totally uncalled for. This wom[a]n has done absolutely nothing wrong.

. . . .

THE COURT: Well, you're asking me to remove a juror because of some interpretation that you have about her demeanor in the jury box?

[CO-COUNSEL]: In her -- intentionally or not, doing things that appear to be trying to influence other jurors.

-41-

THE COURT: Well, I hear what your interpretation is. I'm trying to formulate -- you're saying, again, her demeanor as a juror is what -- you're asking me to remove her because of her demeanor, or your interpretation of her demeanor? I don't hear anything that you're arguing to me that would cause me to think that she should be removed, so I deny your motion to remove the juror.

Later in the trial, after more testimony from defense witnesses, the defense again, outside the presence of the jury, renewed its motion to remove the juror. Defense counsel stated,

I understand the [c]ourt's ruling previously. We would renew our motion regarding our juror here that continues to make faces and roll eyes. [The juror] has continue[d] to do that, and we think that she's -- we were looking at her, and to her it looks like she's clearly made up her mind one way or the other on this case, and we don't think she's a fair juror at this point.

The trial court again overruled the motion.

Following the final charge to the jury, after the alternate jurors were chosen and excused, but before deliberations, the trial court made this observation:

This morning [defense counsel] made a motion concerning [the juror]. From that time until the jurors went out, I have observed [the juror's] demeanor. Not every single minute, but most of the time. In other words, this jury in this courtroom is not to my side, but immediately in front of me, and [the juror] happens to be seated immediately in front of me. I did not observe anything about her demeanor that was unusual during the times that I looked at her. Now, it's rather an unusual, I guess, motion that [defense counsel] made, but he's certainly ought to make every motion that he thinks appropriate. I hardly know how to proceed other than to put on the record my observations of [the juror] since that time, which was around the mid morning break, I think the motion was made.

That juror was later elected foreperson of the Defendant's jury.

The Defendant raised this issue in his motion for new trial[13]: "Certain jury members had made a decision on guilt prior to the closing of proof at trial." In conjunction with the motion for new trial, co-counsel for the Defendant submitted an affidavit. In that affidavit, co-counsel averred that the juror had made "numerous gestures indicating that she was in agreement with the State's witnesses and not in agreement with the defense witnesses." Co-counsel continued that, on one occasion, he saw the juror "attempt to gain the attention of another juror while indicating that she was in agreement with a witness called by the State" and that "these types of actions were common for [the juror] throughout the latter portion of the trial." This ground for relief was overruled.

Both the Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant's right to an impartial jury. An impartial jury is one in which the jurors are "free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting Toombs v. State, 197 Tenn. 229, 270 S.W.2d 649, 650 (Tenn. 1954)). "Once a jury is impaneled, jurors may be discharged from further service prior to deliberations only if found by the trial court to be 'unable or disqualified to perform their duties.'" State v. Cleveland, 959 S.W.2d 548, 551 (Tenn.1997) (quoting Tenn. R. Crim. P. 24(e) (now Tenn. R. Crim. P. 24(f)(2)(B)); see Tenn. Code Ann. § 22-5-312. "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993) (citations omitted). The decision to discharge a juror and to select an alternate juror is left to the discretion of the trial judge. State v. Millbrooks, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991).

It is a generally accepted principle of trial administration that jurors should not "form or express any opinion about the case until it is finally submitted to the jury." Tenn. R. Crim. P. 24(g)(2); see State v. Sexton, 368 S.W.3d 371, 389 n.7 (Tenn. 2012). Like other juror-related issues, including the credibility and demeanor of a juror, the trial court is in the best position to assess a juror's misconduct, such as when a juror is seen sleeping during the presentation of testimony. When the defense moved to remove the juror based upon her facial gestures and body language, the trial court denied motion, reasoning that the Defendant had not provided the court with sufficient information that the juror had already formed an

_____

[13] The State vehemently argues that the Defendant has waived this issue because the record is devoid of any evidence that he ever specifically requested a mistrial. However, the Defendant did lodge an objection at trial to the juror remaining on the jury, and this issue was raised in the Defendant's motion for new trial; this is all that is required for appellate review of the issue of whether the trial court abused its discretion by failing to remove the juror from the venire. We do agree that the request for a mistrial was never thereafter made. Based upon our conclusion that the there was no abuse of discretion in the trial court's decision to allow the juror to remain on the venire, there would likewise be no grounds for a mistrial.

opinion about the Defendant's guilt. The trial court later stated that it had observed the juror in question following the Defendant's motion and found nothing about her demeanor to be "unusual." The Defendant has the burden of demonstrating bias or prejudice, and he has not done so. Jurors are not automatons. See State v. Raynella Dossett Leath, No. E2011-00437-CCA-R3-CD, 2013 WL 2420639, at *32 (Tenn. Crim. App. June 3, 2013), perm. app. filed, (Tenn. Aug. 1, 2013). We hold that the trial court did not abuse its discretion in refusing to remove this juror.

## CONCLUSION

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE